IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ICEBREAKER LIMITED, a New                    3:11-CV-00309-BR
Zealand corporation,

        Plaintiff,                          OPINION AND ORDER

v.

GILMAR S.P.A., an Italian
corporation,

        Defendant.


**SCOTT D. EADS**
**KRISTINA J. HOLM**
Perkins Coie, LLP
1120 N.W. Couch Street
10th Floor
Portland, OR 97209-4128
(503) 727-2192

**JAMES L. VANA**
Perkins Coie, LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101-3099
(206) 359-3036

      Attorneys for Plaintiff


1 - OPINION AND ORDER

**STEVEN T. LOVETT**
**STEVEN E. KLEIN**
Stoel Rives LLP
900 S.W. Fifth Avenue
Suite 2600
Portland, OR 97204
(503) 294-9364

**JOHN C. BLATTNER**
**MICHELLE R. HEIKKA**
**AIMEE R. GIBBS**
**JANE M. FEDDES**
Dickinson Wright PLLC
301 E. Liberty St.
Suite 500
Ann Arbor, MI 48104-2266
(734) 623-1653

**PAUL M. MERSINO**
Butzel Long, a Professional Corporation
150 West Jefferson Avenue
Suite 100
Detroit, MI 48226-4452
(313) 225-7000

**REGINA M. ALTER**
**ROBERT D. PILIERO**
Butzel Long, a Professional Corporation
380 Madison Avenue
22nd Floor
New York, NY 10017
(212) 818-1110

            Attorneys for Defendant


**BROWN, Judge.**

    This matter comes before the Court on Plaintiff Icebreaker

Limited's Motion (#59) for Summary Judgment (No Trademark

Infringement) and Plaintiff's Motion (#62) for Partial Summary

Judgment (No Damages).  For the reasons that follow, the Court

**GRANTS** Plaintiff's Motion for Summary Judgment (No Trademark

2 - OPINION AND ORDER

Infringement) and **DENIES as moot** Plaintiff's Motion (#62) for
Partial Summary Judgment (No Damages).


## BACKGROUND

Plaintiff is a New Zealand company that sells performance
outdoor apparel made of New Zealand merino wool.  According to
Plaintiff's founder, Jeremy Moon, the inspiration for Plaintiff's
ICEBREAKER trademark and business came to him in 1994 via Brian
Brakenridge, a New Zealand "merino wool farmer" who created a
prototype underwear and a thermal t-shirt which Brakenridge
called "Ice Breakers" made from 100% New Zealand merino wool.

Plaintiff has sold outdoor apparel made of New Zealand
merino wool under the ICEBREAKER trademark in New Zealand since
1995.  It is undisputed for purposes of these Motions that when
Moon decided on the ICEBREAKER trademark in 1994, he did not have
any knowledge of Defendant Gilmar S.p.A.'s ICEBERG trademark.

Defendant is an Italian, family-owned business headquartered
in San Giovanni, Italy.  Defendant offers a range of high-end
fashion sportswear and leisure apparel for men, women, and
children.  ICEBERG has been one of Defendant's "flagship"
trademarks for its primary line of clothing, accessories, and
other goods since 1976.  In the past Defendant has also used
other trademarks that include the word ICE for "diffusion"

clothing lines.[1]  Presently ICE ICEBERG is Defendant's only diffusion line.

In the early 2000s Defendant operated ICEBERG boutiques in New York City and Los Angeles.  In 2002 Defendant began marketing ICEBERG goods via a website.  After a period of strong sales from 1999 to 2002, Defendant's sales in the United States declined for several years and reached zero in 2012.

In 2001 Plaintiff began selling clothing such as t-shirts, leggings, and thermal underwear under the ICEBREAKER trademark in the United States through a third-party distributor, who marketed the goods to outdoor and snow-sports retailers.

In 2001 Defendant filed an opposition to Plaintiff's application to register its ICEBREAKER mark in Korea.  Defendant filed similar proceedings in other jurisdictions:  Spain (2003), the European Union (2004), Russia (2006), Poland (2008), Canada (2009), and Macao (2011).  According to Defendant, "some of these proceedings have been decided in favor of [Defendant], some in

---

[1] In the fashion industry a diffusion line is one that is derived from a manufacturer's main line and targets different markets and age groups usually at a lower price point.

favor of [Plaintiff], and some are still pending."[2]

In 2004 Plaintiff created a United States subsidiary, Icebreaker Nature Clothing, Inc. (IBNC), to distribute ICEBREAKER clothing in the United States because Plaintiff was dissatisfied with its third-party distributor.

In 2005 Angela Casiero took over as Vice President of Sales and Marketing for Defendant's subsidiary, Gilmar USA, Inc. Under Casiero's guidance, Defendant's sales rebounded marginally. The record reflects between 1999 and 2004, Defendant's sales of ICEBERG products in the United States averaged between €1.2M and just under €1M. In 2005, however, sales dipped to €645,424 and never rose above €886,603 (2006) again. Decl. of John Blattner, Ex. 1 at 1.

According to Plaintiff, in September 2005 Plaintiff became aware of Defendant's use of the ICEBERG trademark in the United States for the first time when Plaintiff's attorneys received a letter from Defendant's attorneys advising them of the ICEBERG trademark.

In 2007 Plaintiff created another subsidiary, Merino Retail,

---

[2] Defendant does not contend decisions of the Trademark Trial and Appeal Board (TTAB) or other foreign tribunals have authority or preclusive effect in this action, but Defendant brings them to the Court's attention to establish that "different triers of fact can reach different conclusions." As Plaintiff notes, however, the TTAB uses standards in evaluating trademark registrations that differ from those applied in a trademark infringement action in a United States court. Accordingly, these decisions are of limited value here.

Inc. (IBMR), which opened Plaintiff's first store in the United States in Portland, Oregon.  IBMR sells ICEBREAKER goods through its retail stores and the Icebreaker website.

According to Defendant, the global financial crises in 2008 "hit Gilmar hard," and sales in the United States dropped off precipitously.  As noted, however, the record reflects Defendant's sales in the United States were on the decline before 2008.  For example, sales in the United States in 2005 were €645,424 and never rose above the 2006 amount of €886,603 again. In 2010 Defendant's sales in the United States dropped to €158,600.  In 2011 Defendant's sales in the United States were €33,600, and in 2012 they were €0.  Blattner Decl., Ex. 1 at 1.

Indeed, in 2010 Gilmar USA suspended operations and closed Defendant's showroom in New York City and also ceased advertising and marketing efforts in the United States.  In addition, Defendant's website was offline and "under construction" until some time in September 2012, which is after the parties' supplemental briefs were filed in this matter.  At present, according to Stefano Bacchini, Defendant's Marketing and Sales Director Worldwide, the only promotion in the United States by Defendant involves "getting in touch with the customers [in the United States] for invitation [*sic*] to show the collections [in Milan]."  Decl. of Michelle Heikka, Ex. 2 at 7.

In December 2010 Plaintiff opened a retail outlet in New

6 - OPINION AND ORDER

York City.  In November 2011 Plaintiff opened another retail
outlet in San Francisco.  Currently IBNC's retail-outlet
customers are comprised of 90% outdoor stores, 7% running stores,
and 3% biking stores.  In 2011 approximately 49% of IBMR's total
sales were made via the Internet.

On March 11, 2011, Plaintiff filed a Complaint for
Declaratory Judgment of No Trademark Infringement in this Court
in which it seeks a declaration that its use of the ICEBREAKER
trademark is not infringing any rights owned by Defendant in its
ICE trademarks and a declaration that Defendant has ceased using
trademarks in certain Cancellation Registrations and, as a
result, abandoned those marks.[3]

On May 31, 2011, Defendant filed an Answer, Affirmative
Defenses, and Counterclaims in which it, among other things,
counterclaimed for trademark infringement in violation of 15
U.S.C. § 1114, unfair competition in violation of 15 U.S.C.
§ 1125(a), common-law trademark infringement, and common-law
unfair competition.

On May 11, 2012, Plaintiff filed a Motion for Summary
Judgment on the ground of "no trademark infringement" and a
Motion for Partial Summary Judgment on the ground of "no
damages."

---

[3] Defendant concedes it ceased using the trademarks set out
in the Cancellation Registrations set out by Plaintiff.

On July 18, 2012, Plaintiff filed a Reply in support of its Motion for Partial Summary Judgment in which Plaintiff objected to portions of the Declaration and Supplemental Report of Jay Sickler filed by Defendant Gilmar S.p.A. in support of its Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment.

On August 8, 2012, the Court heard oral argument on Plaintiff's objections to Sickler's Declaration and Supplemental Report.  At that time Plaintiff withdrew the portion of its Motion for Partial Summary Judgment related to lack of profits, and the Court granted Plaintiff leave to renew that part of its Motion after the Court resolves Plaintiff's Motion (#59) for Summary Judgment regarding infringement and the remaining portion of Plaintiff's Motion (#62) for Partial Summary Judgment.

On September 7, 2012, the Court heard oral argument on Plaintiff's Motion for Summary Judgment (No Trademark Infringement) and the remaining portion of Plaintiff's Motion for Partial Summary Judgment (No Damages).  The Court directed Plaintiff to file a five-page summary of its argument no later than September 10, 2012, and Defendant to file a five-page summary of its argument no later than September 13, 2012.  The Court took this matter under advisement on September 19, 2012.

**STANDARDS**

"A successful trademark infringement claim . . . requires a showing that the claimant holds a protectable mark, and that the alleged infringer's imitating mark is similar enough to 'cause confusion, or to cause mistake, or to deceive.'" *Surfvivor Media, Inc. v. Surfvivor Prod.*, 406 F.3d 625, 630 (9th Cir. 2005) (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 116 (2004)).  "The critical determination is 'whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product.'" *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008)(quoting *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003)).

"To prevail on the ultimate question . . . - the likelihood of confusion of consumers - [the plaintiff] must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not 'merely possible.'" *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1085 (9th Cir. 2005) (citation omitted).

The Ninth Circuit employs the following eight-factor test (*Sleekcraft* factors) to determine whether there is a likelihood of confusion:  "(1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing

channels; (6) type of goods and purchaser care; (7) intent; and
(8) likelihood of expansion." *Jada Toys*, 518 F.3d at 632
(quoting *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th
Cir. 1979)).

> This eight-factor analysis is "pliant,"
> illustrative rather than exhaustive, and best
> understood as simply providing helpful guideposts.
> *Brookfield Commc'ns*, 174 F.3d at 1054; *see E & J
> Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280,
> 1290 (9th Cir. 1992)("This list of factors, while
> perhaps exhausting, is neither exhaustive nor
> exclusive."). The *Sleekcraft* factors are not a
> scorecard, a bean-counter, or a checklist. *Thane*,
> 305 F.3d at 901. "Some factors are much more
> important than others, and the relative importance
> of each individual factor will be case-specific."
> *Brookfield Commc'ns*, 174 F.3d at 1054.

*Fortune Dynamic, Inc. v. Victoria's Secret Stores*,  618 F.3d
1025, 1030-31 (9th Cir. 2010).

It is a "well-established principle that because of the
intensely factual nature of trademark disputes, summary judgment
is generally disfavored in the trademark arena." *Id.* at 1031
(quotation omitted).


## PLAINTIFF'S MOTION (#59) FOR SUMMARY JUDGMENT
## (NO TRADEMARK INFRINGEMENT)

Plaintiff moves for summary judgment as to all of
Plaintiff's claims and all of Defendant's Counterclaims on the
ground that Plaintiff is not infringing Defendant's trademark.
As noted, the Court must apply the factors set out in *Sleekcraft*

10 - OPINION AND ORDER

to evaluate whether there is an issue of material fact as to a
probable "likelihood that the consuming public will be confused
as to who makes what product."

## I.  Proximity or Relatedness of Goods

When addressing this *Sleekcraft* factor, the Court's "'focus
is on whether the consuming public is likely somehow to associate
[Plaintiff's] products with [Defendant's] products.'" *Fortune
Dynamic*, 618 F.3d at 1036 (quoting *Recot, Inc. v. Becton*, 214
F.3d 1322, 1329 (Fed. Cir. 2000)).  The relevant issue is whether
the "goods can be related in the mind of the consuming public as
to the origin of the goods." *Recot,* 214 F.3d at 1329.  When
"'goods are related or complementary, the danger of consumer
confusion is heightened.'" *Fortune Dynamic*, 618 F.3d at 1036
(quoting *E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280,
1291 (9th Cir. 1992)).

Plaintiff concedes the parties both sell apparel, but
Plaintiff asserts they operate in very different market segments
and, therefore, there is not any probable likelihood of confusion
among the consuming public.  Defendant, in turn, contends even
though the parties operate in different segments at present, they
are "growing ever closer."  For example, Defendant points out
that some of Plaintiff's apparel are dresses and camisoles, which
are not designed for sports performance and could overlap with
some of Defendant's apparel.  Defendant also notes Plaintiff in a

11 - OPINION AND ORDER

December 2011 press release announced a new "collection of mid
layers" that are "versatile enough for any occasion - from a hike
in the hills to an après-ski celebration, to winter travel . . .
[and are] equally at home in the city as [they are] roughing it
in the outdoors."  Decl. of Michelle Heikka, Ex. 25 at 1.

   "[C]ourts have held that the mere fact that two products or
services fall within the same general field . . . does not mean
that the two products or services are sufficiently similar to
create a likelihood of confusion." *Matrix Motor Co., Inc. v.
Toyota Jidosha Kabushiki*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal.
2003)(quotation omitted). *See also Mach. Head v. Dewey Global
Holdings, Inc.*, 61 U.S.P.Q.2d 1313, 1318 (N.D. Cal. 2001)("The
fact that both products could broadly be described as relating to
music is not sufficient to find that the products have a similar
use or function."). "Meaningful differences between the products
and services are often cited as a factor tending to negate . . .
confusion, even when the products are superficially within the
same category." *Matrix Motor*, 290 F. Supp. 2d at 1092 (quotation
omitted).

   Here the record reflects even though Plaintiff makes some
things like dresses and camisoles and workout and exercise
apparel that people theoretically could wear anywhere as opposed
to only for athletic activities, Plaintiff's products are
demonstrably different from Defendant's products:  Plaintiff

designs, markets, and sells its clothing as performance active wear; Plaintiff's website organizes apparel by activities such as biking, hiking, fishing, mountaineering, running, and skiing; Plaintiff's stores are organized by activity, and both the website and the stores contain photos and advertisements of people engaged in athletic activities; and Plaintiff advertises its clothing in various sporting and outdoors magazines. Plaintiff's witness Deborah Boswell testified at deposition that Plaintiff views companies such as Smart Wool, Ibex, Patagonia, and North Face as its main competitors.

In contrast, the record reflects Defendant is an Italian fashion company.  Defendant's advertising in various foreign fashion magazines[4] features runway models wearing designer apparel.  Defendant's clothing appears on models in the Milan fashion show.  Moreover, even though there is a small overlap in pricing, Defendant's ICEBERG apparel generally sells for considerably more than Plaintiff's ICEBREAKER apparel.

Defense witness Stefano Bacchini conceded at deposition that Defendant does not promote any of its clothing for outdoor or sporting activities.  Although Defendant asserts it sells sportswear, Bacchini made clear at deposition that Defendant uses the term sportswear to mean things like "a simple jacket"; *i.e.*,

---

[4] Defendant does not currently advertise in American fashion magazines.

13 - OPINION AND ORDER

"You can have a wool coat with a T-shirt with a jeans [*sic*].
This is sportswear.  Everybody can wear it.  It's sportswear
[*sic*] look."  Decl. of Kristina Holm, Ex. 1 at 2.  The fact that
Defendant chooses to categorize some of its clothing as
sportswear, however, does not give rise to an inference that its
clothing is confusingly similar to Plaintiff's performance
attire.

In addition, the record reflects Defendant's apparel is
generally much more expensive than Plaintiff's apparel.  The
lowest priced item sold under the ICEBERG mark is a t-shirt that
costs €140 (approximately $180-190), and the most expensive items
retail for approximately $3,000 "very easily."  Holm Decl., Ex. 8
at 2.  Plaintiff's price for a base-layer, long-sleeved top is
approximately $90, Plaintiff's "Tech Ts" are approximately $75,
and Plaintiff's winter jackets are $200-450.

On this record the Court concludes the *Sleekcraft* factor for
proximity or relatedness of goods favors Plaintiff.

## II.  Similarity of the Marks

"Although some of the *Sleekcraft* factors will not always be
helpful in assessing the likelihood of confusion, 'the similarity
of the marks . . . has always been considered a critical question
in the likelihood-of-confusion analysis.'"  *Fortune Dynamic*, 618
F.3d at 1031-32 (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202
F.3d 1199, 1205 (9th Cir. 2000)).

14 - OPINION AND ORDER

> Three general principles help determine whether
> marks are similar.  First, "[s]imilarity is best
> adjudged by appearance, sound, and meaning."
> *Entrepreneur*, 279 F.3d at 1144.  Second, the
> "marks must be considered in their entirety and as
> they appear in the marketplace."  *GoTo.com*, 202
> F.3d at 1206.  Third, "similarities are weighed
> more heavily than differences."

*Fortune Dynamic*, 618 F.3d at 1032.

### A.    Sight

The examples of Plaintiff's trademark all contain the word "icebreaker" in lower-case letters in a rounded font and include the Icebreaker logo and some combination of a descriptor of the item such as "NEW ZEALAND MERINO," "PURE MERINO," or "NATURE CLOTHING."  In contrast Defendant's trademark is "ICEBERG" in capital letters in a straighter font and occasionally includes the phrase "MADE IN ITALY."

Defendant points to some articles of Plaintiff's apparel that have "ICEBREAKER" all in capital letters like Defendant's trademark, but, as Plaintiff notes, even those examples include the phrase "NEW ZEALAND MERINO" underneath "ICEBREAKER."  In *Surfvivor* the Ninth Circuit held:  When "considering the degree of similarity between the two marks, courts should analyze each mark within the context of other identifying features."  406 F.3d at 633.  In *Surfvivor* the Ninth Circuit compared the trademarks "Surfvivor" and "Survivor" and concluded the trademarks were dissimilar because the Survivor trademark was "usually accompanied by the distinctive slogan

15 - OPINION AND ORDER

'outwit[,] outplay[,] outlast,' or a stylized graphic."  *Id.*

Most often Plaintiff's trademark is displayed in a way that is visually different from Defendant's trademark and when Plaintiff's trademark is all in capital letters like Defendant's trademark, Plaintiff also includes a descriptor such as "NEW ZEALAND MERINO."  On this record the Court concludes pursuant to *Surfvivor* that Plaintiff's trademark, in conjunction with its other identifying features, is visually dissimilar from Defendant's trademark.

**B.   Sound**

Iceberg and Icebreaker both begin with "ice" followed by a "B" sound and an "R" sound shortly thereafter.  Plaintiff relies on *The Learning Internet v. Learn.com, Inc.*, No. CV 07-227-AC, 2009 WL 6059550 (D. Or. Nov. 25, 2009)(Findings and Recommendation adopted by Judge Malcolm Marsh on Mar. 18, 2010), to support its assertion that the trademarks are aurally dissimilar.  In *Learn.com* the trademarks at issue were LEARN2.COM and LEARNING.COM.  The court, however, noted the defendant in that case did "not refute that the two marks sound different." *Id.*, at *18.  Accordingly, *Learn.com* is unhelpful here.

Plaintiff also relies on *Nautilus Group, Inc. v. Savvier, Inc.*, 427 F. Supp. 2d 990 (W.D. Wash. 2006).  In *Nautilus Group* the marks at issue were Bowflex and BodyFlex.  The court noted the "two marks are dissimilar except for the common

16 - OPINION AND ORDER

suffix 'flex.'  The common sound of flex is not sufficient ground
for this Court to conclude that Bowflex and Bodyflex sound alike.
The sound of the two marks does not give rise to confusion."  *Id*.
at 996.

Defendant does not point to any cases to support its
assertion that the parties' marks sound sufficiently alike to
generate confusion.  Nevertheless, as noted, Iceberg and
Icebreaker contain the same first syllable closely followed in
both words by "B" and "R" sounds.  The Ninth Circuit has advised
when evaluating the likelihood of confusion, "similarities
[between marks] are weighed more heavily than differences."
*Fortune Dynamic*, 618 F.3d at 1032 (quotation omitted).
Accordingly, the Court concludes for purposes of Plaintiff's
Motion that Plaintiff has not established Icebreaker and Iceberg
are sufficiently dissimilar in sound to avoid any likelihood of
confusion.

C.    **Meaning**

Webster's Dictionary defines Iceberg as "1:  a large
floating mass of ice detached from a glacier;  2:  an emotionally
cold person; 3:  Iceberg lettuce." *Merriam-Webster's Collegiate
Dictionary* 614 (11th ed. 2003).  Icebreaker is defined as "1:  a
ship equipped (as with a reinforced bow) to make and maintain a
channel through ice; 2:  something that breaks the ice on a
project or occasion; *esp*:  mixer." *Merriam-Webster's Collegiate*

17 - OPINION AND ORDER

*Dictionary* 614 (11th ed. 2003).

Defendant contends Iceberg and Icebreaker "convey related connotations."  Defendant, however, does not point to a case that establishes conveying "related connotations" is sufficient to establish a likelihood of confusion when the terms themselves are both well known and have different meanings.

The Court concludes on this record that Defendant has not established a reasonable consumer would likely be confused between the meaning of the words iceberg and icebreaker.

As noted, the Court concludes the sight and meaning of the parties' trademarks are dissimilar.  The parties' trademarks sound similar, however, when spoken.  In light of the Ninth Circuit's admonishment to weigh similarities in marks more heavily than differences, the Court concludes on balance that this *Sleekcraft* factor does not favor either party.

## III. Evidence of Actual Confusion

"[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding."  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012)(citing *Playboy Enter., Inc. v. Netscape Comm'n Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004)).  "Perhaps [b]ecause of the difficulty in garnering [evidence of actual confusion], . . . we have held that [s]urvey evidence may establish actual confusion."

*Fortune Dynamics*, 618 F.3d at 1035 (quotations omitted).

Defendant does not point to any evidence on the record of consumer confusion either through survey evidence or anecdotal evidence.  According to Plaintiff, therefore, this factor favors Plaintiff.  Plaintiff relies on *Cohn v. Petsmart, Inc.*, to support its assertion.  In *Cohn* the Ninth Circuit noted:

> Because evidence of actual confusion can be difficult to obtain, its absence is "generally unnoteworthy" and is given little probative weight.  *See Brookfield Comm'n, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1050(9th Cir. 1999). Here, however, the parties used the same trademark in the same city for six years to market closely-related goods and services.  Under these unusual circumstances, some evidence of actual confusion should have become available if Petsmart's coexisting use had created a genuine likelihood of confusion.  *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999) (lack of evidence about actual confusion after an ample opportunity for confusion "can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion").

281 F.3d 837, 842-43 (9th Cir. 2002).

Defendant notes in its Response that the Ninth Circuit has held proof of actual confusion is not a required element for a trademark-infringement claim and even though "evidence that the use of two marks has already led to confusion is persuasive proof that future confusion is likely, the converse is not true." *GoTo.com, Inc.*, 202 F.3d at 1208.

The Court finds the facts here are not sufficiently similar to those in *Cohn* for the Court to conclude that this is the type

of unusual circumstance in which lack of evidence of actual
confusion gives rise to an inference of likelihood of confusion.
Unlike in *Cohn*, the parties here did not have stores in the same
cities at the same time and had very little overlap in
advertising or marketing.  For example, although both parties
sold clothing in the United States as set out above, they sold
very different kinds of clothing to different types of consumers;
Defendant closed its boutique in New York in 2010, while
Plaintiff opened a store in New York for the first time in
December 2010; and Defendant had its highest level of sales in
the United States between 1999 and 2004, but Plaintiff did not
have a store in the United States until 2007.  Thus, this record
does not reflect the kind of intense overlap between the parties'
trademarks that triggered the Ninth Circuit's conclusion in *Cohn*.
The Court, therefore, concludes the lack of evidence that the use
of the parties' trademarks has led to confusion is not persuasive
proof that future confusion is likely.  Accordingly, the Court
concludes this *Sleekcraft* factor slightly favors Plaintiff.

**IV.  Marketing Channels**

    "Convergent marketing channels increase the likelihood of
confusion." *M2 Software*, 421 F.3d at 1083.  *See also Sleekcraft*,
599 F.2d at 353.  In *Sleekcraft* the court concluded the parties'
marketing channels overlapped and, as a result, increased the
likelihood of confusion because both the plaintiff and the

defendant

>       sell[] through authorized retail dealers in
>       diverse localities.  The same sales methods are
>       employed.  The price ranges are almost identical.
>       Each line is advertised extensively though
>       different national magazines are used; the retail
>       dealers also promote the lines, by participating
>       in smaller boat shows and by advertising in local
>       newspapers and classified telephone directories.

*Id*.

As noted, Plaintiff makes substantial sales on its website.
For example, 49% of IBMR's sales were made via Plaintiff's
website in 2011.  In contrast, Defendant did not have a
functioning website accessible to United States customers from
2010 through the end of September 2012.  In fact, at the time of
the hearing on Plaintiff's Motion, Defendant did not have a
functioning website.  In its Post-Hearing Brief in Opposition to
Plaintiff's Motion, however, Defendant advised the Court that its
website was "scheduled for relaunch" at the end of September
2012.  The Court takes judicial notice of the fact that
www.iceberg.com is an active website as of the date of this
Opinion and Order, but it still does not appear to support
purchases of Defendant's products in the United States.  In any
event, even if Defendant's website supported the purchase of
Defendant's products in the United States, the Ninth Circuit
recently pointed out that "it would be the rare commercial
retailer that did not advertise online, and the shared use of a
ubiquitous marketing channel does not shed much light on the

21 - OPINION AND ORDER

likelihood of consumer confusion." *Network Automation, Inc. v. Adv. Sys. Concepts*, 638 F.3d 1137, 1151 (9th Cir. 2011)(citation omitted).  Accordingly, even if both Plaintiff and Defendant were selling their goods in the United States on the internet, it would be insufficient standing alone to establish a probable likelihood of consumer confusion.

In any event, it is undisputed that Plaintiff and Defendant do not sell their products in the same retail outlets:  Plaintiff sells its clothing in its own stores and in outdoor, ski, running, and cycling retail outlets; Defendant sells its apparel at fashion boutiques outside of the United States and in the United States by soliciting specific clients and inviting them to Milan to place orders.  According to Casiero, Defendant's salespersons sit down with clients, flip through pictures in a "look book," identify products that they like, and order them through the salesperson.  Bacchini did not identify any plans to alter the way that Defendant markets and sells its products in the United States.

In addition, even though both Plaintiff and Defendant advertise their products in magazines, the magazines are quite different in their focus and target demographics.  For example, Defendant's products are advertised in fashion magazines such as *Harper's Bazaar, Elle*, and *Marie Clair* and are promoted by celebrities from the fashion and entertainment world whereas

Plaintiff's goods, on the other hand, are advertised in outdoors and sports magazines such as *Rocky Mountain Sports, Outside Magazine, Yoga Journal, Backpacker*, and *Ski* and are promoted by athletes. In *M2 Software* the Ninth Circuit concluded differences in marketing channels such as these "weigh[] heavily in the ultimate assessment that there [is] no triable issue of the likelihood of confusion." 421 F.3d at 1084. The plaintiff in *M2 Software* argued

> Madacy uses the same marketing channels because Madacy also launched its M2 Entertainment branded record label during a music industry trade show; because both M2 Software's M2 mark and Madacy's M2 Entertainment mark had been advertised in similar magazines; and because both M2 Software and Madacy had established a music industry presence in Los Angeles, New York, Miami, and Nashville.

*Id*. at 1083. The Ninth Circuit noted

> M2 Software, however, fails to discuss important distinctions in the marketing channels used. M2 Software promoted its M2 products in specialty music industry publications, whereas Madacy did not promote its M2 Entertainment CDs in these publications. Furthermore, M2 Software argues that both marks were launched at the same trade show. However, even though Madacy launched its M2 Entertainment record label at the same trade show, it did so nearly a decade after M2 Software launched its M2 products.
>
> Next, even though both M2 Software and Madacy offered their CDs for sale over the internet in general, and on "Amazon.com" in particular, M2 Software failed to provide evidence of sales attributable to M2 Software's website. Finally, unlike Madacy's music albums, M2 Software's products were not sold in retail outlets.

*Id*. at 1083-84.

Finally, the record reflects the parties target different consumer groups. Plaintiff targets outdoor and sports markets and consumers of active and outdoor clothing. Defendant targets affluent consumers of fashion apparel and considers brands such as Cavalli, Dolce & Gabbana, and Anna Molinari to be its competitors.

On this record the Court concludes Defendant has not pointed to facts that establish the parties have or use converging marketing channels so as to create a likelihood of confusion. Accordingly, the Court concludes this *Sleekcraft* factor favors Plaintiff.

**V.   Type of Goods and Purchaser Care**

This *Sleekcraft* factor relates to "the relative sophistication of the relevant consumer, and the degree of care likely to be exercised by that consumer." *Fortune Dynamic*, 618 F.3d at 1038. "Low consumer care . . . increases the likelihood of confusion." *Network Automation*, 638 F.3d at 1152 (quotation omitted).

"The reference point for this factor 'is the typical buyer exercising ordinary caution.'" *Fortune Dynamic*, 618 F.3d at 1038 (quoting *Sleekcraft*, 599 F.2d at 353). "This 'standard includes the ignorant and the credulous.'" *Id*. (quoting *Sleekcraft*, 599 F.2d at 353). Nevertheless, the Ninth Circuit "expect[s] the typical buyer 'to be more discerning — and less easily confused —

24 - OPINION AND ORDER

when he is purchasing expensive items.'"  *Id.* (quoting *Brookfield Commc'ns*, 174 F.3d at 1060).

Courts have held most consumers exercise a high degree of care when purchasing expensive items such as race cars, pleasure boats, and costly print-advertising packages.  *See, e.g., Matrix Motor Co.* 290 F. Supp. 2d at 1092; *Sleekcraft,* 599 F.2d at 349; *Official Airline Guides, Inc. v. Gross*, 6 F.3d 1385, 1393 (9th Cir. 1993).  Courts have also held consumers exercise very little care when purchasing inexpensive products such as peanuts and dog food.  *See, e.g., Beer Nuts v. Clover Club Foods Co.,* 805 F.2d 920, 927 (10th Cir. 1986); *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000).

It is less clear whether the Court can assume the degree of care that most consumers would exercise with respect to products between those two extremes such as the products at issue here. Nevertheless, Plaintiff relies on *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* for the proposition that individuals purchasing clothing generally exercise a relatively high degree of care.  In *Jordache* the Tenth Circuit concluded the district court's finding that consumers are likely to exercise a high degree of care in purchasing clothing that costs between $15 and $60 was not clearly erroneous.  828 F.2d 1482, 1487 (10th Cir. 1987).  The district court's finding, however, was not based on or supported by any evidence or analysis set out in its opinion.  Accordingly,

25 - OPINION AND ORDER

the finding in *Jordache* is of limited use here.  In addition, the
Court notes the relevance of a 25-year-old case is questionable
when evaluating the dollar amount that determines when
individuals will exercise a higher degree of care in their
purchases.

In *Fortune Dynamic* the defendant asserted "[p]urchasers of
apparel are considered . . . sophisticated consumers" and pointed
to "one court's observation that 'fashion-conscious' young women
'are likely to exercise a significant degree of care in
purchasing their clothing, since the name of the particular
designer is important in the fashion world.'"  618 F.3d at 1038
(quoting *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 609 (S.D.N.Y.
1997)).  The plaintiff pointed out, however, that the Ninth
Circuit had not set out a "clear standard . . . for analyzing
moderately priced goods, such as non-designer clothing." *Id.*
The Ninth Circuit concluded it could not "determine with any
degree of confidence the relative sophistication of the parties'
consumers." *Id.*  Similarly, the Ninth Circuit noted more
recently:

> Helmets are not like T-shirts, but neither are
> they like cars.  We agree with the district
> court's assessment:  "a customer may not be as
> discerning when purchasing less expensive items
> such as t-shirts, but the higher price of helmets
> would involve a higher degree of care by
> purchasers."

*One Industries*, 578 F.3d at 1165 n.4.

26 - OPINION AND ORDER

Defendant's clothing, however, unlike the clothing at issue in *Fortune Dynamic* or inexpensive t-shirts, is designer clothing shown on runways in Milan and sold by models and celebrities.  It is generally quite expensive and includes items that retail for approximately $3,000 "very easily."  Accordingly, the Court concludes this *Sleekcraft* factor weighs somewhat in Plaintiff's favor because Defendant's clothing is the type for which customers would exercise a higher degree of care to purchase due to the price and the designer, and, therefore, the likelihood of confusion would be reduced.

**VI.   Intent**

> "While an intent to confuse consumers is not required for a finding of trademark infringement, intent to deceive is strong evidence of a likelihood of confusion.  When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived."

*One Industries*, 578 F.3d at 1163 (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002)).

Defendant asserts in its Post-Hearing Brief that even though it does not contend Plaintiff adopted the ICEBREAKER trademark with the intent to deceive the public, Plaintiff intentionally continued to use the ICEBREAKER trademark in the United States after September 2005 when Plaintiff's attorneys received a letter from Defendant's attorneys advising Plaintiff of Defendant's

27 - OPINION AND ORDER

ICEBERG mark.

In *One Industries* the defendant asserted the plaintiff "intended to trade on the goodwill established by [the plaintiff's] O' mark."  578 F.3d at 1163.  To support its assertion, the defendant argued

> at the time [the plaintiff] planned its helmet line, it knew [the defendant] was selling helmets. [The defendant] also emphasize[d] [the plaintiff's] admission that in planning its helmet line it looked [at] what was going on in the helmet business and grabbed pretty much the best helmets in the industry.  Given that [the defendant's] helmets were among the best selling helmets, it is reasonable to infer that [the plaintiff] grabbed [the defendant's] helmets. Finally, [the defendant] points out that [the plaintiff] did not place its name on its helmets. By doing this, [the defendant] contends, its intent to trade off the strength of [the defendant's] mark can be inferred.

*Id*. at 1163-74 (quotations omitted).  The Ninth Circuit concluded

> [t]he evidence of intent to deceive [the defendant] proffers is weak, to say the least. [The defendant] provides no evidence that grabbing the best helmets in the industry had anything to do with [the defendant's] O' mark.  In addition, [the plaintiff] points out that the name "One Industries" appears on the boxes and product literature accompanying its helmets, and that [the plaintiff] used the two primary logos they had been using the previous five years, the 'One Icon' and the 'One Angular' marks.  Because [the defendant] offers nothing linking [the plaintiff] to the Rounded O' mark, no reasonable jury could conclude that [the plaintiff] intended to deceive consumers by trading off the goodwill associated with the Rounded O' mark.  Accordingly, the lack of evidence of intent to deceive also supports the district court's conclusion [that this factor weighs in the plaintiff's favor].

*Id.* at 1164.

Here, as noted, Plaintiff began selling products with the
ICEBREAKER trademark in the United States in 2001 when Plaintiff
was not aware of Defendant's ICEBERG mark in the United States.
There is not any evidence that Plaintiff "looked to" Defendant's
products or acted in any way to cause the public to confuse
Plaintiff's products with Defendant's products after 2005 when
Plaintiff was aware of Defendant's mark.  Plaintiff advertises
its products as performance gear in different magazines than
Defendant and sells its products in a different manner and in
different cities than Defendant, and Plaintiff's trademark is not
substantially similar to Defendant's trademark and is generally
accompanied by the statement that Plaintiff's products are made
from New Zealand wool.  Thus, Defendant does not point to any
evidence in the record to support an inference that Plaintiff
continued to use the ICEBREAKER mark after 2005 with the intent
to deceive the public about the origin of Plaintiff's goods.

In *M2* the district court found "[the plaintiff] failed to
present evidence that would justify a trier of fact in concluding
that [the defendant] . . . had any intention of capitalizing on
[the plaintiff's] trademark."  421 F.3d at 1085.  The Ninth
Circuit agreed and concluded the district court did "not err in
concluding that the seventh *Sleekcraft* . . . factor . . . leans
towards [the defendant's] favor."  *Id.*

29 - OPINION AND ORDER

The same is true here.  Because Defendant does not point to any evidence to support an inference that Plaintiff continued to use its ICEBREAKER trademark with the specific intent to confuse the public, the Court concludes this *Sleekcraft* factor leans in Plaintiff's favor.

## VII. Likelihood of Expansion

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a '*strong possibility*' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing.  When goods are closely related, any expansion is likely to result in direct competition." *Sleekcraft*, 599 F.2d at 354 (quotation omitted; emphasis added).  "[W]hat is relevant is the substance of the two companies' respective products and services, not the characterizations or labels offered by the parties regarding the products and services." *Groupion, LLC v. Groupon, Inc.,* No. C 11-00870 JSW, 2012 WL 1655728, at *9 (N.D. Cal. May 8, 2012).

Defendant asserts Plaintiff has already expanded its business to compete with Defendant's business.  Defendant notes Plaintiff has opened stores in New York City, San Francisco, and San Jose and plans to open a store in suburban Washington, D.C. Defendant also points to a 2007 article in *Men's Vogue* relating to the author's use of Icebreaker "high-performance" thermal

leggings as evidence that Plaintiff's products have been featured in a fashion magazine.  Finally, Defendant notes Plaintiff currently makes clothing that is not specifically directed at sports (*e.g.,* camisoles, dresses, and shirts) and that Defendant also makes clothing such as dresses and shirts that are not specifically directed at sports or outdoor activity.

The Court finds Defendant's evidence does not support an inference that the "substance of the companies' respective products" is not distinctly different or that Plaintiff is expanding its business in such a way as to compete with Defendant.  Again, Defendant sells high-end fashion clothing. Although a few pieces of Defendant's clothing could be worn when engaging in some sports such as "perhaps" tennis or hiking, Defendant does not allege its clothing could be described as performance sportswear.  Similarly, even though Plaintiff makes some products that can be worn in contexts other than sports or athletic activities, the heart of Plaintiff's business and products is based on New Zealand merino wool specifically engineered, designed, and marketed for sporting activities. Finally, many companies have stores in New York City, San Francisco, San Jose, and/or suburban Washington, D.C., and the record reflects Plaintiff's stores in those locations are like their other stores in the United States in that they contain and emphasize performance sportswear made from New Zealand Merino

31 - OPINION AND ORDER

Wool rather than high-fashion clothing.

The Court concludes Defendant has not pointed to evidence that gives rise to an inference of a "strong possibility" that Plaintiff is expanding its business to compete with Defendant. Accordingly, the Court concludes this *Sleekcraft* factor favors Plaintiff.

## VIII.  Strength of the Mark

### A.  Merits

"As a general matter, '[t]he more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws.'" *Fortune Dynamic*, 618 F.3d at 1032 (quoting *GoTo.com*, 202 F.3d at 1207). "A mark's strength is evaluated conceptually and commercially." *Id*.

> A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers. The less obvious the connection, the stronger the mark, and vice versa. Using a list originally formulated by Judge Friendly, *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976), marks are placed in one of five categories, ranging from weakest to strongest: generic, descriptive, suggestive, arbitrary, and fanciful, *GoTo.com*, 202 F.3d at 1207. At one end of the spectrum, generic marks "refer[ ] to the genus of which the particular product is a species," such as "bread" or "door," and "are not registerable" as trademarks. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S. Ct. 658, 83 L. Ed.2d 582 (1985). At the other end of the spectrum

>are arbitrary marks — actual words with no
>connection to the product — such as Apple
>computers and Camel cigarettes, and fanciful
>marks — made-up words with no discernable
>meaning — such as Kodak film and Sony
>electronics that are inherently distinctive
>and therefore receive "maximum trademark
>protection." *Entrepreneur*, 279 F.3d at 1141.

*Id*. at 1032.

It is undisputed that ICEBERG is a "conceptually strong, arbitrary mark that does not describe apparel." Plaintiff, however, contends a variety of factors substantially weaken Defendant's mark.  Specifically, Plaintiff points out that there are a number of trademarks that include "ice" in the apparel industry such as SUNICE, ICECREAM, ICETEX, ICE BOX, and PINK ICE.  According to Plaintiff, therefore, "it is a crowded field in which use of the term 'ice' fails to distinguish any particular user."

The Ninth Circuit has held  "[w]hen similar marks permeate the marketplace, the strength of the mark decreases.  In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd."  *One Industries,* 578 F.3d at 1164 (quotation omitted). In *One Industries* the court held "[t]he record. . . contains several examples of [marks similar to the defendant's] O' marks used by different companies, including Oakley, OGIO, and Alloy MX.  Such use of other 'O' symbols weakens the Rounded O' mark." *Id*. at 1164-65.

33 - OPINION AND ORDER

Similarly, in *Halo Management, LLC v. Interland, Inc.*, the court noted when a "crowded [trademark] field is hemmed in on all sides by similar marks on similar goods,. . . the ability of any member of this field to prevent use by others is relatively weak." 308 F. Supp. 2d 1019, 1034 (N.D. Cal. 2003). In *Halo* the court found the field of use for the plaintiff's HALO trademark to be crowded due to the presence of third-party uses of trademarks in "a field which at least broadly would include or be related to plaintiff's business" such as halosec.com, haloelectronics.com, and Halo Platforms. *Id*. Accordingly, the court concluded "[a]ny individual user of the 'halo' term [such as the plaintiff], thus lacks significant ability to prevent the use of 'halo' by others in the field." *Id*.

Defendant, nevertheless, contends "a lack of commercial strength cannot diminish the overall strength of a conceptually strong mark" and relies on *adidas America v. Calmese*, 662 F. Supp. 2d 1294 (D. Or. 2009). As Plaintiff points out, however, the issue in *adidas* was whether the trademark owner's poor sales weakened its trademark rather than whether the field was crowded with similar marks. Accordingly, *adidas* is not helpful here.

On this record the Court concludes this *Sleekcraft* factor slightly favors Plaintiff due to the fairly crowded field of marks that include the term "ice."

In summary, using the *Sleekcraft* factors as "guideposts" in

34 - OPINION AND ORDER

the Court's analysis, the Court notes seven of the eight *Sleekcraft* factors favor Plaintiff and one is neutral.  In addition, several of the factors that favor Plaintiff (such as the proximity or relatedness of the goods, marketing channels, evidence of actual confusion, and type of goods) are particularly relevant under the circumstances here.

On this record and viewing the evidence in the light most favorable to Defendant, the Court concludes Defendant has not identified sufficient evidence to permit a rational trier of fact to find a probable likelihood of confusion between the parties' products.  Accordingly, the Court grants Plaintiff's Motion for Summary Judgment (No Trademark Infringement).

### PLAINTIFF'S MOTION (#62) FOR PARTIAL SUMMARY JUDGMENT (NO DAMAGES)

As noted, Plaintiff also filed an alternative Motion for Partial Summary Judgment (No Damages).  Because the Court granted Plaintiff's Motion for Summary Judgment as to the issue of trademark infringement, however, the Court denies as moot the still-pending portion of Plaintiff's alternative Motion for Partial Summary Judgment.

### CONCLUSION

For these reasons, the Court **GRANTS** Plaintiff's Motion (#59)

35 - OPINION AND ORDER

for Summary Judgment (No Trademark Infringement) and **DENIES as**

**moot** the still-pending portion of Plaintiff's Motion (#62) for

Partial Summary Judgment (No Damages).

     IT IS SO ORDERED.

     DATED this 26th day of November, 2012.


                  /s/ Anna J. Brown

                  _____

                  ANNA J. BROWN
                  United States District Judge